UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| JANA CHRISTINE OSTRANDER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. |
| ) | 5:10-CV-00074-BG |
| ) | ECF |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

### Statement of the Case

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), Plaintiff Jana Ostrander seeks judicial review of a decision of the Commissioner of Social Security denying her application for disability insurance benefits and supplemental security income. The United States District Judge transferred this case to the United States Magistrate Judge for further proceedings. The undersigned provided Ostrander with an opportunity to consent to the jurisdiction of the United States Magistrate Judge, but she did not do so. Pursuant to the order of assignment, the undersigned now files this Report and Recommendation.

An Administrative Law Judge (ALJ) held a hearing on September 9, 2008, and determined on January 26, 2009, that Ostrander was not disabled. Specifically, the ALJ held that Ostrander had the residual functional capacity (RFC) to perform light work with additional special limitations. Based on testimony from a vocational expert, the ALJ further concluded that there were jobs that existed in significant numbers in the national economy that Ostrander could perform in spite of her

1

limitations. The Appeals Council denied review on February 22, 2010. Therefore, the ALJ's decision is the Commissioner's final decision and properly before the court for review. *See Higginbotham v. Barnhart*, 405 F.3d 332, 334 (5th Cir. 2005) (Commissioner's final decision "includes the Appeals Council's denial of [a claimant's] request for review").

**Factual Background**

Ostrander previously worked as a cook, cashier, shift manager, assistant manager, and airline station agent. (Tr. 114.) She claims that she became disabled on July 14, 2007. (Tr. 80, 85.) On that date, she was on her way to work when her rear passenger tire blew out, causing her Suburban to roll over. (Tr. 22-23.) She was admitted to the hospital with a cervical spine fracture and right vertebral artery occlusion. (Tr. 204, 210.) A CT scan revealed slight subluxation of two vertebra. (Tr. 204, 210.) Physicians discussed treatment options with Ostrander, who opted to receive a neck brace. (Tr. 204.)

On July 19, 2007, Ostrander was transferred from the acute side of the hospital to the rehabilitation unit for inpatient rehabilitation therapy. (Tr. 144, 173.) At her initial evaluation in the rehabilitation unit, she needed moderate to minimal assistance with "most of her activities of daily living." (Tr. 174.) Her medications effectively controlled her pain. (Tr. 177.) On July 27, 2007, she was discharged in stable condition to continue rehabilitation on an outpatient basis. (Tr. 108, 144, 173.) By that time, she had improved to the point that she was "at standby assistance level for bed mobility and independent level for transfers" and could walk about 1,000 feet "without assistive devices at an independent level." (Tr. 177.)

On August 21, 2007, Ostrander was discharged from her outpatient rehabilitation program. (Tr. 189-90.) Therapists reported that she "made excellent gains in the 4 weeks of therapy and was

2

able to participate in very high level upper extremity strengthening exercises." (Tr. 190.) Although right upper extremity strength and endurance "were not fully met[,]" her strength and endurance "progressed very well." *Id.*

On August 23, 2007, Nevan Baldwin, M.D. examined Ostrander and reported that she had continued numbness in her left index finger and mild weakness of her left triceps. (Tr. 286.) Dr. Baldwin noted that his nurse, who had also examined Ostrander, thought that she had some weakness of her right biceps and brachioradialis. (Tr. 285-86.) However, Dr. Baldwin examined those muscles and thought they were normal. (Tr. 186.) Ostrander's x-rays showed "clear progression of subluxation" at two vertebra. *Id.* Dr. Baldwin thought that surgery was appropriate, and Ostrander opted to proceed with the operation, which Dr. Baldwin performed in two stages on August 29, 2007, and August 31, 2007. (Tr. 162, 168, 186.) A post-surgical x-ray revealed that Ostrander's bony alignment was normal. (Tr. 151.) She was discharged on September 4, 2007, with instructions to wear a neck brace and prescriptions for pain medication and a muscle relaxant. (Tr. 171.)

Ostrander started outpatient rehabilitation on September 18, 2007. (Tr. 185-87.) At an appointment with Dr. Baldwin on September 25, 2007, Ostrander reported "a substantial amount of right shoulder pain." (Tr. 284.) Dr. Baldwin reported that Ostrander "ambulated into the examining room . . . without any signs of discomfort[.]" *Id.* Her left arm symptoms had "improved substantially since surgery and appear[ed] to be improving daily." *Id.* The next day, Dr. Baldwin opined that Ostrander should not return to the type of work she previously did as an airline station agent, which required her to issue tickets, direct airplanes, and load luggage weighing up to 100 pounds. (Tr. 26, 283.) He stated that Ostrander was "able to work in jobs involving administrative

3

duties or similar positions." *Id.* He stated that she "should not be involved in work that involves repetitive lifting nor [a job] that involves a substantial degree of heavy manual labor." *Id.*

At Ostrander's next appointment with Dr. Baldwin on October 15, 2007, she reported that she was getting much better and did not have neck pain. (Tr. 282.) Dr. Baldwin commented, "Though there are certainly employment situations that [Ostrander] will be able to perform, I really do not think it is reasonable or safe for her to return to her prior job at the airline." *Id.* X-rays revealed improvement in Ostrander's cervical spine and right shoulder. (Tr. 288-89.)

On November 5, 2007, Ostrander completed a Daily Activity Questionnaire. (Tr. 122-24.) She reported, "I cannot sit or stand for too long, my neck, back, & shoulders start giving me pain." (Tr. 122.) When asked to describe what she does on an average day, she reported that she would go to town with whoever is available to drive her that day to pay bills or grocery shop, cook, clean the kitchen, and watch some TV. *Id.* She indicated that her physical problems did not limit her ability to hear, speak, read the newspaper, watch TV, or use the phone. *Id.*

At an appointment on November 29, 2007, Ostrander reported that she had "very little in the way of neck pain" and expressed "delight with her recovery thus far." (Tr. 279.) She had 4+/5 strength in her right deltoid, right biceps, right brachioradialis, and left triceps. *Id.* She had 5/5 strength in all other portions of her arms. *Id.* She complained of numbness in two left-hand fingers. *Id.*

On December 23, 2007, Ostrander went to the emergency room for shortness of breath. (Tr. 347-49.) She was diagnosed with asthma and acute bronchitis. (Tr. 349.) Medication was prescribed, and she was discharged as stable. *Id.* On January 8, 2008, she went to the hospital for wheezing and was diagnosed with acute exacerbation of asthma. (Tr. 341-46.) A physical

4

examination revealed that she had normal range of motion in her extremities. (Tr. 343.) Medication was prescribed, and she was released after her condition improved with instructions to limit activity. (Tr. 345.)

At an appointment on February 11, 2008, Ostrander reported pain across the base of her neck radiating into her right trapezius area. (Tr. 338.) She stated that the pain was "tolerable for the most part" but became "much more bothersome" at times. *Id.* Her biceps and brachioradialis strength had improved, but she continued to have "significant triceps weakness." *Id.*

On September 9, 2008, Ostrander testified at a hearing before the ALJ. (Tr. 17-32.) She was represented by counsel at the hearing. (Tr. 19.)

## **Standard of Review**

A plaintiff is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3) (2010).

"In evaluating a disability claim, the Commissioner conducts a five-step sequential analysis to determine whether (1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity." *Audler v. Astrue*, 501 F.3d 446, 447-48 (5th Cir. 2007); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2010). "The claimant bears the burden of showing she is disabled through the first four steps of the analysis; on the fifth, the Commissioner must show that there is other substantial work in the

national economy that the claimant can perform." *Audler*, 501 F.3d at 448. Before proceeding to steps 4 and 5, the Commissioner must assess a claimant's RFC, defined as "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 404.1520(a)(4)(iv)-(v), 416.945(a)(1), 416.920(a)(4)(iv)-(v) (2010).

Judicial review of a decision by the Commissioner is limited to two inquiries: a court must "consider only whether the Commissioner applied the proper legal standards and whether substantial evidence in the record supports the decision to deny benefits." *Audler*, 501 F.3d at 447; 42 U.S.C. § 405(g) (2010) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"). "Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). "Conflicts in the evidence are for the [Commissioner] and not the courts to resolve." *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990).

## Discussion

Ostrander argues that substantial evidence does not support the ALJ's determination of her RFC. (Pl.'s Br. 8-9.) In addition, she argues that the hypothetical question that the ALJ posed to the vocational expert was defective. (Pl.'s Br. 9-10.)

**I.      Substantial evidence supports the ALJ's determination of Ostrander's RFC.**

"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b),

416.967(b) (2010).

In the instant case, the ALJ found that Ostrander had the RFC to perform light work except that she could not work overhead, drive, or have concentrated exposure to dust, fumes, or gases and could only occasionally use her right hand. (Tr. 11.) Ostrander complains that this RFC is insufficient because it does not include limitations for (1) the amount of weight she can lift when occasionally using her right arm, (2) pushing or pulling, or (3) concentration deficit due to pain. (Pl.'s Br. 8-10.)

As noted above, the definition of light work limits an individual to lifting no more than 20 pounds at a time; it also limits an individual to only some pushing or pulling. 20 C.F.R. §§ 404.1567(b), 416.967(b) (2010). The following substantial evidence supports the ALJ's conclusion that Ostrander could perform these activities: As the ALJ noted, at an appointment with Dr. Baldwin on October 15, 2007, Ostrander reported that she was getting much better, and tests revealed that she had 4/5 strength in her right biceps, 4+/5 strength in her right brachioradialis and left triceps, and 5/5 strength in all other parts of her arms. (Tr. 10-11, 282.) These results caused Dr. Baldwin to opine that "there are certainly employment situations that [Ostrander] will be able to perform." (Tr. 11, 282.) The ALJ also noted that tests on November 29, 2007, revealed that Ostrander had 4+/5 strength in her right deltoid, right biceps, right brachioradialis, and left triceps and 5/5 strength in all other parts of her arms. (Tr. 11, 279.) Finally, the ALJ noted Dr. Baldwin's report on February 11, 2008, that Ostrander's biceps and brachioradialis strength had improved, although she did continue to have significant triceps weakness. (Tr. 11, 338.)

Ostrander's progress at physical therapy parallels the improvements noted by Dr. Baldwin and reflected in her arm strength tests. At an appointment on September 18, 2007, Ostrander

7

reported that she needed help washing her hair, putting on her neck immobilization collar, and putting her right arm through a sleeve to dress. (Tr. 186.) At an appointment on October 11, 2007, her arm strength had improved so that she could dress independently, put her immobilization collar on by herself, and help fold laundry at home. (Tr. 180-81.) On a questionnaire dated November 5, 2007, she reported that she walked, used a therapy band and putty, and lifted her arms and legs while lying on the bed for exercise. (Tr. 123.) She also reported that she could grocery shop, cook, and clean the kitchen. *Id.*

Ostrander reported that she had been able to lift up to fifty pounds prior to her car accident. (Tr. 115-20.) Accordingly, the high scores on her arm strength tests and improvements noted at appointments in her general strength and ability to care for herself are "such relevant evidence as a reasonable mind might accept as adequate" to support the conclusion that she could lift up to 20 pounds at a time and do some pushing and pulling. *Watson*, 288 F.3d at 215.

Substantial evidence also supports the ALJ's decision not to include a concentration deficit limitation in Ostrander's RFC. The record contains no objective medical evidence of concentration deficit or any evidence that Ostrander ever complained about concentration limitations to a treating physician. Ostrander complained of concentration limitations only in her hearing testimony. (Tr. 30.) In the following exchange between Ostrander and her attorney, she indicated that pain was the only cause of her alleged concentration deficit:

> Q: Okay. What about your concentration and your ability to stay focused when you have the pain in your shoulder and your neck?
>
> A: It's hard to concentrate. You know, I can be carrying on a conversation with somebody and just lose my train of thought because the pain is so intense, you know. It's like talking to you and sharp pain, and I completely forget.

>    Q: Do you have that on a daily basis?
>
>    A: Yes, ma'am.

*Id.*

Symptoms such as pain render an individual disabled only to the extent that "alleged functional limitations and restrictions due to [pain] can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4) (2010). "Objective medical evidence is evidence obtained from the application of medically acceptable and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) (2010). To the extent that an individual's statements about the intensity, persistence, and limiting effects of pain are inconsistent with objective medical evidence, the ALJ "must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). "Pain must be constant, unremitting, and wholly unresponsive to therapeutic treatment to be disabling." *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001). An ALJ's credibility findings regarding the intensity and persistence of pain are not reversible error if they are supported by substantial evidence. *See Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994).

In his denial of benefits, the ALJ acknowledged Ostrander's testimony that her "pain makes it difficult for her to concentrate." (Tr. 13, 30.) The ALJ also recognized her testimony that she had constant pain in her right arm, between her shoulder and her spine, and at the top part of her spine; numbness and pain in all five fingers of her right hand and two of the fingers in her left hand; and pain in her knees, hips, and back. (Tr. 12, 21-22, 29-30.) The ALJ concluded that Ostrander's

9

complaints of pain were "out of proportion to the objective medical evidence." (Tr. 13.) Specifically, the ALJ held that Ostrander's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence, and limiting effects of those symptoms are not credible[.]" *Id.*

In addition to the previously discussed arm strength test results, the following substantial evidence supports the ALJ's conclusion: At a physical therapy appointment on September 18, 2007, Ostrander reported that her pain was 3/10 without medication and 0/10 with medication. (Tr. 186.) At an appointment on September 25, 2007, Dr. Baldwin noted that Ostrander "ambulated into the examining room . . . without any signs of discomfort[.]" (Tr. 284.) At a physical therapy appointment on October 11, 2007, Ostrander reported that her pain ranged from 0/10 to 6/10. (Tr. 180.) She reported that she was "getting much better" and did not have neck pain at an appointment with Dr. Baldwin on October 15, 2007. (Tr. 10, 282.) On that date, Dr. Baldwin commented that "there are certainly employment situations that [Ostrander] will be able to perform." (Tr. 11, 282.) On November 29, 2007, Ostrander reported "very little in the way of neck pain[.]" (Tr. 11, 279.) A physical exam on January 8, 2008, revealed normal range of motion in her extremities. (Tr. 343.) On February 11, 2008, she reported that her pain was "tolerable for the most part" but became "much more bothersome" at times. (Tr. 11, 279, 338.) As the ALJ noted, this evidence is "inconsistent with [Ostrander's] testimony of constant, severe pain." (Tr. 13-14.)

For the foregoing reasons, the ALJ was not required to include limitations in Ostrander's RFC for the amount of weight she could lift when occasionally using her right arm, pushing or pulling, or concentration deficit due to pain.

**II.     The hypothetical question posed to the vocational expert was appropriate.**

An ALJ may rely on the testimony of a vocational expert to determine whether jobs exist in the national economy that a claimant can perform. *See Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995) (substantial evidence supported ALJ's holding that jobs available to claimant existed in the national economy because vocational expert testified to that effect and explained how he arrived at his conclusions). Where an ALJ bases a determination of non-disability on the testimony of a vocational expert in response to a hypothetical question, the hypothetical question is defective and constitutes reversible error if either of the following is true:

> 1.   The hypothetical question did not incorporate reasonably all disabilities of the claimant recognized by the ALJ, or
>
> 2.   The claimant or his representative was not afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical question (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question).

*Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

In the instant case, the ALJ asked the vocational expert if there were many jobs that could be done by someone with Ostrander's age, education, and work history, who was limited to light work, had "marked restriction in the use of her right dominant arm," could use her right dominant arm only occasionally, could not do overhead work, could not drive, and could not experience concentrated exposure to dust, fumes, or gases. (Tr. 33-34.) The vocational expert responded that someone with those limitations could perform, for example, the jobs of information clerk and usher. (Tr. 34.) The expert further testified that there were 3000 information clerks in Texas and 60,000 in the national economy and that there were 8000 ushers in Texas and 80,000 in the national

11

economy. *Id.* Ostrander's attorney asked the vocational expert whether the expert's answer would change if the person in question were unable to concentrate more than 30 percent of the time due to pain. (Tr. 34-35.) The vocational expert answered that if the person were unable to complete the task before them, "it would impair their ability to maintain those jobs." (Tr. 35.)

The ALJ found that Ostrander had the following severe impairments: C5-7 fracture, status-post cervical anterior and posterior fusion, asthma, and obesity. (Tr. 9.) The ALJ accounted for all of these impairments when he predicated the question posed to the vocational expert on Ostrander's RFC. (Tr. 11, 33-34.) As previously discussed, substantial evidence supports the ALJ's determination of Ostrander's RFC. Furthermore, Ostrander's attorney was given the opportunity to suggest any purported defects in the ALJ's question, and the attorney took advantage of that opportunity by asking a hypothetical question that included a limitation for concentration deficit. (Tr. 34-35.) Accordingly, the hypothetical question was proper and does not constitute reversible error. *See Bowling*, 36 F.3d at 436.

## Conclusion

For the foregoing reasons, this court recommends that the United States District Court affirm the Commissioner's decision and **DISMISS** Plaintiff's complaint with prejudice.

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2010); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found.

An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: June 1, 2011.

_____
NANCY M. KOENIG
United States Magistrate Judge